The next case on the court's docket is 513-0179, Kevin Tatham v. Edwards Field v. Arlene Fields. Mr. Keller. Good afternoon. Good afternoon. May it please the court. Mr. Stoneman, my name is Rick Keller, and I represent the defendants of Tellens, Ed, and Arlene Fields. Now, we believe that the Fields have four bases, any one of which would justify this court reversing the trial court's judgment and entering judgment in their favor. The first one I'd like to talk about is adverse possession. Now, the elements of adverse possession are well known. Every first-year law student taking property one would be able to tell you the elements. There must be 20 years of concurrent existence of five elements. Continuous possession, hostile and adverse, actual possession, open and notorious, exclusive possession under a claim of title inconsistent with that of the true owner. Now, the trial court in this case found or held that the defendants did not establish any of the elements of adverse possession. I would suggest that a careful review of the record would seem to show that the only element about which that there could be an argument would be the hostile adverse element. And that's because the Tathams claimed that the use of the boat dock was permissible. Mr. Tatham testified that when he purchased his lot in 1994, he knew where the lot lines were. And he knew that the boat lift that was owned by the Fields predecessor, Amos Motzinger, was on Tatham property. Yet, Mr. Tatham never said anything to Mr. Motzinger. Tatham never said anything to Fields until May of 2009, long after the 20-year period of adverse possession had run. Now, Mr. Tatham explained this by saying, well, I said nothing to Mr. Motzinger. I had been coming to the lake since 1983. Mr. Motzinger was a friend. We had a friendly, almost familial-type relationship. But the Tathams had no such relationship with the Fields. I think back to the first house I bought in 1979. I was a proud new homeowner, and I wanted my place to look, you know, the best place on the block. So, the day I moved in, I was out in the yard trimming and picking up trash and taking care of things. And my neighbor came over. And I thought, oh, how nice. A housewarming gift. Maybe some chocolate chip cookies. Well, Mrs. Davis was an elderly woman, and she came over, said who she was, and proceeded to tell me that the split rail fence that was in my front yard encroached on her yard by six inches. It's just not credible, I suggest, that if one knows that a neighbor is encroaching on their property, that when a new neighbor moves in, that you don't go to that new neighbor and say, welcome to the neighborhood, by the way, your split rail fence, or in this case, your boat dock, is on my property. Yet, Mr. Tatham did not do that. He never challenged the field's ownership of that boat dock, or where it was located, until 2009. So, I would suggest that his conduct is just flatly inconsistent with the idea of permissive use. So, I believe that the elements of adverse possession have been established. Now, the second basis that I'd like to talk about is the easement, or a claim of easement. Now, obviously, this is in the alternative to the adverse possession. Defendants' group exhibits one and two at trial were deeds in the chain of title for lot six, which is the Tatham lot, and lot seven, which is the field's lot. In August of 1961, Hudson, who was a prior owner of Tatham's lot six, conveyed a 70-by-12-foot strip out of lot six to Becker, who was a prior owner of field's lot seven. Now, that deed contained this language, it being the intention hereby to give and grant to the grantee herein his heirs, successors, and assigns access for boating to the water, and if for any reason the water does not touch the above-described track, then access over and across land owned by the grantors is hereby given for boating rights only. Now, that language is clearly a grant of easement. And an easement owner is entitled to the necessary use of the easement. Now, necessary use has been defined as that which is reasonably necessary for the full enjoyment of the premises. Now, an instrument that creates an easement is construed in accordance with the intention of the parties. And that intention is as obtained by looking at the words of the instrument, the state of the thing conveyed, and the objective to be obtained. Now, it seems elusive that to have full enjoyment of a home on a lake and full enjoyment to exercise boating rights, one must have a boat dock. An easement for boating rights would be meaningless without the ability to access the water with a boat from the lot, or the ability to access the lot from a boat that's on the water. That access requires a boat dock. Now, a court's task in resolving controversies involving easements is to balance the rights of the And I would suggest that here that that balance clearly tips in favor of the fields. Now, the third basis for finding in favor of the fields would be the concept of an irrevocable license. Now, if the adverse possession claim fails and the claim for easement fails, the field's use of the boat dock, which they had used, we suggest they and their predecessor entitled for more than 20 years, but if there's no adverse possession or no easement, then their use of that boat dock would have to be by way of a license. And again, the law in regard to licenses is well settled. A license is a revocable privilege to go upon the land of another for a specified purpose. However, courts have held, and the case I cited in the brief, Martin v. Seeley, courts have held that a license cannot be revoked if to do so would operate as a fraud upon the licensee. And that is the situation here. The Martin case, that court held the license was irrevocable. Even though, in the Martin case, the court said there were other means of access to the eastern part of the Wilson property, but those other means of access were not convenient, and it presented difficulties with respect to the use of farm equipment. In our case, other means of access to the lake for boating are not convenient, and it presents difficulties in getting a boat to the water or the boat out of the water. But didn't things start to fall apart when your clients put a permanent boat dock or boat lift in place of a temporary or one that was not, you know, adhered to the realty? Well, you're correct. That's when the problems start. Those problems start long after 20 years of adverse possession and run. I still don't see the significance of whether it's a temporary boat lift or a permanent boat lift if one occupies it and uses it to the exclusion of everyone else. Well, that might go against that presumption. If it had been temporary, and the argument is that it was a permissive use, and then all of a sudden it becomes permanent, that obviously would be against, you know, against that person's right of ownership. Well, if it were permissive use. Yes, presumably. If we assume it was permissive use, but I don't believe that it was permissive use. Because, as I said, it just does not seem credible. But if it's permissive use, and I know that someone is approaching on my property, even with a temporary structure, for example, a portable garage type thing, I would go tell that neighbor, hey, you're on my property. It's okay, but you're on my property. But that didn't happen here. Now, getting back to the irrevocable license, to deny access to the boat dock would impair the value and the desirability of the field's house on the lake. And it's the conduct of Tatum in this case that I suggest makes the license, if you find that it was permissive use, that makes it a fraud to allow him to revoke that license now. Mr. Tatum said nothing to Amos Motzinger as he remodeled and retooled his boat lift. He said nothing when he watched Mr. Fields replace the Motzinger lift with a larger one, and he did not complain to anyone until 2009. And I would suggest that that constitutes a fraud if he's allowed to revoke access to that boat dock in this case. And finally, we believe that the judgment the trial court entered in favor of the plaintiffs on their claim of ejectment should be reversed because, quite simply, the plaintiffs didn't prove all of the elements of ejectment. The trial court noted there are three elements that a plaintiff must allege and prove in an ejectment action. Number one, plaintiffs had possession of subject premises after obtaining legal title. Two, that the defendant subsequently took possession of the premises. And three, that now the defendant unlawfully withholds possession. There's no evidence in the record regarding elements one and two. Absolutely not. The boat dock was there in its location when Tatum bought his lot. Now he says, oh, I sat on the boat dock and drank beverages with and fished with Mr. Motzinger. But that doesn't equate to possession. In the cases that I've cited in the brief, if a plaintiff can't show possession in himself or a predecessor, then he must trace his title back to the government. There was no evidence showing that. So we believe that the plaintiffs failed to prove the elements of ejectment, so the judgment in their favor on that point should be reversed. Now, as I said initially, I believe any one of these four bases would justify this court in overturning the trial court's decision. And so we would request that the trial court's judgment be reversed and judgment be entered in favor of the defense. Thank you. Thank you. Good afternoon. Good afternoon. I'm Tony Sunderman, and it's my privilege to represent Kevin and Sarah Tatum in the trial and in this appeal. If it pleases the court and the counsel, with all due respect, maybe you don't like what the trial court did. Maybe you disagree. Maybe you don't think it came out right. But we're not here to do a final argument. We're not here to retry the case. We're here because the defendants allege the trial court committed error, and they allege and claim that the trial court's decision was against the manifest weight of the evidence. And I'm here to suggest to you that that's not true. The test for manifest weight is whether or not, when viewed most faithfully to the prevailing party, the opposite conclusion is clearly apparent. Our courts have held that in order to violate the manifest weight, the opposite result must be apparent. And that's simply not the case in this proceeding. First of all, the defendants had the burden of proof on their affirmative defense, and their burden of proof is clearly convincing evidence. Not just what's more probably true than not, but what's clearly and most apparently correct, the test, is that quantum of proof that leaves no reasonable doubt in the mind of the finder of fact as to the truth of the proposition in question. That's the defendants' burden. Now, what was the evidence? The plaintiff testified that he'd been visiting this spot since 1983. He owned the house since July 15th of 1994. And perhaps a little geography's in order. This isn't Lake Carlisle or Lake Michigan. This is a little fingerlet on a small lake, Mattoon, in Neoga, Cumberland County, Illinois. This cove where the defendant, the plaintiff, and the other neighbors reside is about 80 feet wide. The lots are like 40 and 50 feet wide. You don't need binoculars to look across the way. It's a small neighborhood. The plaintiff testified he knew where the property lines were when he bought the property. He knew that the boat lift that was used by Amos Matsinger was on his lot. Amos was an elderly man like his own father. He allowed the boat dock to be there. He even allowed Amos to rebuild it during the course of Amos' residency there. The testimony was that he maintained all of the 70-foot strip that he owned, including where the boat dock was. He cleaned it up. He also fished off of the dock that Matsinger owned. And there is some reference to mysterious beverages being consumed by people, including the plaintiff and Mr. Matsinger, on the boat lift. The defendant testified that he never talked to Matsinger about the property lines. In fact, he never met Matsinger at one time, and that was at the closing. The defendant testified that he had a survey done two years after he bought the property. And he then claimed that he constructed this boat lift pursuant to an oral authorization granted him by the plaintiffs in July of 2009. The most important testimony, I think, in the whole proceeding came not from the parties, but from the defendant's lawyer. Mr. Whitney Hardy testified. He was a 50-year practitioner in Shelbyville, and he offered testimony that he had been hired by the defendants to, and I want to quote this, work out an arrangement with the client's neighbor regarding a boat lift. Work out arrangements with the neighbor for the boat lift. The witness identified Exhibits 4, 5, 6, 7, 8, and 9. And those were drafts of license agreements and easements, some prepared by myself, some then modified by Mr. Hardy. Most important is Exhibit 9, which is the last draft prepared by Mr. Hardy. That was a license agreement that contained a provision that it was irrevocable unless all of the parties of the successors in interest signed off on it. And more important, the document contained a paragraph on page 2 that provided, whereas the grantees, that's the defendants, have previous to the day hereof used and constructed a boat lift on the property of the grantors, my client, and now desire to use in the grantees' sole discretion a portion of the grantors' property. For the creation, construction, installation, and maintenance of the boat lift. That was never signed? Never signed by my clients. It was signed by the defendants. And the most important significant thing was it was signed by them on September the 21st, 2009. After it had blown up. I was just going to ask, is this after the dispute arose? Well, after the dispute arose. So this is a settlement negotiation. It wasn't even offered as a settlement negotiation. It was their final position. This is the lawyers going back and forth, you and their lawyers, and trying to figure something out. True, but the defendants signed. Would this have mattered if the court had found adverse possession? If the court had found adverse possession, it wouldn't have mattered. Right, it wouldn't have mattered. But it's evidence that the parties themselves, the fielders, didn't think they had adverse possession. They're trying to resolve the lawsuit. I have a question. When your clients bought the property, was the easement recorded and part of the title report? The easement? Yes. So when your clients bought the property, they were aware that there was this easement for the boat. To get to the water. There was an easement for access to boating. There was not an easement. Boating? That's right, boating. There was not an easement for the construction of a boat. Well, how does one get a boat into the water without either a ramp, which you can back it in, or you can have a floating dock, which you put the boat on? You can have a floating dock. You can have a ramp. That's right. There was testimony from the defendant. He could put his boat in the water in any number of places around the cove, but not at his place because of the seawall. But the easement itself described a very specific strip of land that went over your client's property. Yes. And it was recorded and went with the land as the land was sold.  So how did the court get around the easement? The court said, if I may quote you, the language would suggest a grant of easement for boating rights. It does not authorize the placement or erection of any structure, permanent or otherwise, on the plaintiff's property. That's at the common law record page 247. How do you get a boat in the water if not for a ramp? This device, this device this man built, isn't a dock either. Don't be confused by what the defendant said a minute ago about how we'd like to have a boat dock. This isn't a boat dock. This is a building, a permanent structure that is a boat lift that takes the boat up out of the water and stores it above the surface of the land. And when that was being built, did your clients object? They were gone. So when did they first object after it was built? The minute they got back and saw it. How far in time was that? The first conversation was had July the 3rd. They got back from an anniversary trip to Scotland just the day before the Labor Day weekend of 2009. The testimony about the initial conversation involved a man named Jack Poth, P-O-F-F. He's the guy that built this thing. Mr. Poth, my client, Mr. Fields, all met on July the 3rd because this project involved the erection of a seawall as well as Mr. Fields wanting to build this boat lift. At that time, and repeatedly, the objection wasn't to a boat lift. It was to a permanent structure that was tall and obliterated, obscured the vision of my clients as they looked across the pond. The original boat lift that Amos Monster had sat on the lake bottom on steel pipes with feet like squares of steel and just sat there and you could move it. And it was low and it didn't obstruct the vision of the people in this pond. My client told Fields he didn't want a big permanent structure. That was the rub. It wasn't a lift period. It was a big structure, a permanent structure. Poth testified that this thing is built on steel casing sunk below the bed of the lake, stuffed with rebar, and then filled with concrete. And the builder of this thing is kind of proud of it. He says you can't tear it down. It's permanent. That's exactly what the Fields did not want. And the easement that you're referring to never authorized and could not be construed to authorize a permanent structure. This court, in 1977, in a kind of obscure case called Abisher v. Zogrist, Z-O-P-R-I-S-T, ruled that to be enforceable, the language of the easement must be clear and certain. It's clear and it's certain that there are voting rights granted to the Fields law. There is certainly no clarity to the fact that you can use that language to construct a permanent large structure on the lake. And that's what the trial court reasoned. That's what the trial court held with respect to that language. So to me, did the trial court throw out the easement or just say that you've gone beyond the language of the easement? The trial court didn't find that the easement was bad or didn't throw it out. The trial court simply said that that language doesn't authorize the placement or erection of any structure. And you said that your client met on July 3rd with the defendant and the builder? Yes, they were all there. And so your client objected and the builder went on anyway? The builder went on and did what Fields told him he wanted built. Because he was building Fields' seawall. Let me address the issue of Martin v. See. Martin v. See is a relatively recent court district case and it's an interesting case. It's a classic equity case. It's chancery at its best. A road used for generations for access to the eastern part of the Martin land suddenly gets shut off. The court considers all the evidence. Here's testimony from all the neighbors about the use of the road over the years. A lawyer from the Marshall and Clark County area testified as to his conclusions about what the abstract of title showed. And opined that the subject tract had been the subject matter of a partition many years ago. Some pieces were landlocked and some were not. The court concluded very correctly that you can't allow people to commit to farm, build structures, and generally develop a farm and then shut off the access way because you happen to own the roadway. And that's really all Martin v. See says. There's nothing parallel in this instance with the Martin v. See case. And I would suggest to you that certainly there's no fraud. In fact, I think the fraud language used in Martin v. See is fraud in the chancery term, not fraud in the action. Finally, the plaintiffs are entitled to their judgment for ejectment. To argue that they weren't in possession of the land flies in the face of the evidence we're in. The fields has testified that they occupied the full strip of land, they maintained it, they took care of it. There's no dispute as to the ownership of the tract. It's admittedly owned by the fields and their predecessors entitled. They allowed Motzinger to use the boat lift. They also used it. There's no question but that they were in possession of the property. If you examine the evidence, you'll find that the structure, and this is sort of an interesting thing, this survey in the common law record shows you that the structure built by fields isn't in the same place that the Motzinger structure was. So even if the court was entirely wrong in its initial evaluation of where this building or this boat lift was, the new boat lift is in a different spot. And the surveyed evidence establishes that. For that reason and for the other reasons, Your Honor, I think the trial court did it right. I think the decision, maybe you don't like it, maybe you don't agree with it, but it's consistent with the manifest weight of the evidence. And I think to hold otherwise would be error. Thank you very much. Are there any questions? Any more questions? No, thank you. Rebuttal. Thank you all. I'll try to be brief, although that's sometimes not possible for attorneys when they have the opportunity to speak. Mr. Sunderman seems to think that all the issues decided by the trial court, the standard of review, is manifest weight of the evidence. The easement issue is a question of law. That is reviewed to no vote. And the Hahn case that I decided holds that. The court is correct. The negotiations with the preparation by Mr. Hardy of the license agreement were settlement negotiations. It was an effort to try and stop what has happened and culminates here today from happening. It's important to note that that license agreement that Mr. Hardy prepared had language that it was irrevocable. Because Mr. Hardy knew and the Fields knew that to not allow them to use this boat dock would amount to a fraud. The fact that the Fields may have known that they were not the record title holder is of no moment. The Joiner case, the Supreme Court case that I cite in brief, says that to hold it because the possessor knows or should know that record title is in another precludes the possibility of possessor's title being adverse is the antithesis of the document of adverse possession. So it makes no difference whether the Fields knew, whether they had a white heart, empty head, or whether they knew that they were encroaching. With regard to this July 3rd meeting, the record at RC 401 indicates that Mr. Fields testified that at that July 3rd meeting with he, Tatum, and Poff, when Poff was explaining how this boat dock would be constructed, that Mr. Tatum gave his approval to that construction. So that's a question of fact. Excuse me. Was the boat dock that was eventually constructed, was it placed in the southwest corner of the land granted? Yes. I mean, it does encroach. There's no question about that. It encroaches what? Onto Tatum property. Beyond the easement? Yes. The easement says it has to be constructed in the southwest corner thereof. Well, again, the court can interpret the intention of the parties by the language. But as the Hahn case and other cases point out, the owner of the easement, in this case Fields, is entitled to the necessary use. And I submit that the necessary use justifies, I mean, the object to being obtained with this easement was to allow boating rights. Boats are a lot bigger now than they were in 1961. And as a result, docks have to be bigger. That's why Mr. Motzinger retooled his boat dock. He needed a larger one for a larger boat. That's why Mr. Fields replaced Motzinger. How big is the lake there? I don't know how many acres. It is significantly smaller than Lake Carlisle. It's probably, if you're familiar with Lake Sarah and Effingham, it's probably about that size. I mean, you don't have massive ocean liners on it. Do you have a 26-foot boat? How big was the boat? I believe it was a 26-foot boat. A 26-footer? So, again, I believe any one of the four bases that I mentioned, again, I believe this court will be justified in reversing the decision. But, again, the easement question is a question of law. That's reviewed de novo. But I believe that the judgment should be reversed. Thank you. Thank you. This matter will be taken under the Constitution. Okay. Last but not least. Thank you, gentlemen. Thank you. We now call 5-110549, Ivo v. Christopher Watkins. Ms. Lisko? Yes. You may proceed when you're ready. Okay. Counsel? Mr. Watkins is the third and the final defendant in the Randy Farrar case. Because two other defendants have already been before this court, Demetrius Cole and Chris DiDonago. I'm not going to go into a lengthy recitation of facts. But just very, very quickly, Chris DiDonago and boyfriend Demetrius Cole decided that Randy Farrar was an easy mark for money. They decided to go to his house. They offered my client, Christopher Watkins, $40. Would you please drive us? That's all they said. Would you please drive us there? So he agreed. A little 16-year-old girl, Chandra Jones, went with them. At Farrar's house down on the Lane side, later, Cole, who is the defendant's brother, decided it was a good idea that Cole and Watkins go in, too. So they entered the house. Eventually, money was taken, and Mr. Farrar was killed. It's pretty much undisputed that Cole is the one that pulled the trigger, not Mr. Watkins. The real question at Watkins' trial was whether he was there knowingly and voluntarily. He didn't argue legal compulsion, but that he was just dragged into this thing piece by piece by his brother. He was convicted of robbery and the first-degree murder and was sentenced to 45 years, which is the same sentence that Cole and Notko got. Mr. Watkins was denied a fair trial because of not one but an accumulation of errors. While none of these errors by themselves are enough maybe to justify his trial, put together, they do show that he got an unfair trial. And they're set out in the brief, and I'm going to just touch on a couple of them. For example, defense counsel was not allowed to thoroughly impeach Chandra Jones, who was the state's main witness. She had lived in the area, but he wanted to show that she had lived in this area. But she made no attempt to run away when she saw a crime being committed. She made no attempt to report the crime, nothing. How was he not allowed to impeach her? He wanted to show that she had lived there. But, I mean, how was he prevented from doing that? He wasn't allowed to ask those questions. The court in Limine or just shut him down or what? I didn't follow that. I'm sorry, just objected to, I mean, just affirmed the objections from the state. But now they were able to show that she was familiar with the area by virtue of that Southern 30 home or whatever it is. Sort of. The problem with Jones was that even though she had already testified at Donahoe's trial and at Cole's trial, she said, I don't know, more than 40 times in Watkins' trial. There was a whole lot of things that she was very unclear about, even though, like I said, this was her third time testifying. She was unclear about a lot of things. So he wanted to nail it down and show that she really did know that area, not just that she said she did. For the purpose of this was to show that she stayed because she wanted to stay? Or I'm not sure what you were getting at. Because didn't she say at this trial that she didn't leave because she wasn't afraid of both of the defendants? Right. The two brothers. I'm sorry. Yes. The counsel wanted to show that, in fact, she knew where she was. She knew, presumably, where there were safe places to go, that if she was really afraid, she could have left. But she said she wasn't afraid. So I don't understand how that would have explained that. Well, maybe it didn't go to her afraidness. And maybe it just went to the fact that she stayed instead of leaving when she saw a crime being committed. Okay. Like I said, each of these by themselves is not reversible error. The other thing was that Detective Kemp was allowed to speculate. He said that the next day Krista Donahoe made this phone call to Farrar's house. Why did he make it? Well, no, there was no evidence about why she made it. But he said, well, to see if anybody was still alive or if the police were there. He doesn't know, yet he was allowed to testify to that. Was there objection to that testimony, that question and testimony? I do believe it was objected to. I believe so, yes. Okay. Kemp also testified, and again, I think it was over objection, that two of the state's witnesses had changed their name. The implication there was they changed their name because of this trial. And finally, the detective testified to triple hearsay. He said that defendant's mother had said that defendant told her that Cole was the one who killed Farrar and that defendant was involved in it. But that was also in the tape that was played to the jury? Yes. The corroboration of that by the defendant himself, correct? I mean, that's not in dispute. Incorporation of the fact, yes. The fact itself isn't in dispute. Correct. That's correct. Except that the problem with the tape was on the tape, Kemp is seen in several places saying, now, Chandra Jones told me this. Chandra Jones, according to Jones, is that the jury was never instructed on how to use that hearsay testimony. They should have been instructed at defendant's request that it can't be considered substantively, that it was just part of the interrogation. But they were never so instructed, so they could clearly have considered, well, she said this at trial, and even though she didn't testify to these things, she must be telling the truth because this detective says so. And finally, the jury was not instructed on the definition of knowing. I'm sorry, did you have another question? No, I was going to ask you something about that instruction. Okay. Go ahead. Again, the willfulness of the defendant being there was at the center of his trial. You know, was he, like I said, it's not a compulsion under the law defense, but it was, was he kind of dragged into this? Did he take off going, yeah, we're going to get him and get his money and perhaps kill him? But, you know, when I read your brief, it looked like you just wanted to give that last portion, the number three bracketed paragraph. Were you intending, did you propose the entire instruction? Well, it wasn't me, but, yeah, defense counsel did. They did, because it just says here that the pertinent part was the third bracket, which is only supposed to be given if the first two paragraphs are given. Oh, I think the third bracket was, was the part that you wanted, yeah. That's right. Okay. To go with the rest of the, I'm sorry, to go with the rest of the instruction. I think it was the third bracket part that was in dispute, not the rest of the instruction. Okay. So you're saying then that the court did give 5.01B paragraph one and two? Or am I not following you? Because there's three, there's three, there's three paragraphs. And reading the committee notes, you know, there's kind of guidance as to which should be given when or can be given, because the whole instruction is discretionary unless under Browder there was a request by the jury as to a definition of knowing. So I want, what I'm trying to figure out is what, what was an issue? Did they want just to give the third paragraph or the first, second, and third paragraph? Well, he wanted to give the whole thing, but it was the third paragraph I think that is what told the court, is what the court decided not to give. Not to give. Okay. Okay. And you think that was there? Yes, I do. Because if, he was charged originally with felony murder. If the jury found that he did not knowingly commit the robbery, then he couldn't be convicted of felony murder. So yes, it was important that the jury be properly instructed. And finally, we wanted to argue that he received the same sentence as Donahoe and Cole. He didn't get exactly the same time, though. I thought that they had some added time for other, you think they got exactly the same amount of years? I think so. I think that's what the DOC website showed. I could be wrong, but I, I have the other case, and Franco is on it, his brother's case. And I thought he got a few more years. Or if they got more years, it wasn't on the, on the Murph. Okay. They shouldn't have gotten the same amount of time on this murder. Obviously, Mr. Weckens was clearly not as culpable as the other two. They were the ones who planned it, they were the ones who executed it. He was just along for the ride. The rest of the congress either reverse his conviction or reduce his sentence. Thank you. Thank you. Thank you. Thank you. I plead the court, counsel. I'm Assistant Attorney General Erin O'Connell on behalf of the people of the state of Illinois. The important issue in this case is that petitioner, or the defendant, rather, forfeited all of his claims of trial error. None of them were raised in the post-trial motion, regardless of whether there was any contemporaneous objection. But for the most part, there were none of those either. With respect, and to be clear, the defendant's burden is to demonstrate plain error. The defendant has failed at this argument or in defendant's brief to really set forth why any of these errors should be considered plain error. The defendant, in Section 2 of the brief, focused on the jury instruction issue, doesn't even mention plain error. Doesn't mention the fact that none of these were raised in the post-trial motion. That should be considered forfeiture of a plain error type argument in this case. With respect to the issues in Section 1, the evidentiary objections, there, too, the defendant's treatment of plain error is at best cursory. In fact, the defendant disclaimed any reliance on Problem 1 of the plain error standard. As this court will recall, Problem 1 is the closely balanced evidence. Problem 2 is the fundamental fairness problem, which is intended to encompass structural errors. Defendant disclaimed any reliance on the closely balanced problem. With respect to the structural error, there, too, as we've argued in our brief, the argument is so deficient as to itself amount to a forfeiture of a plain error argument. The second form of plain error equates, as the Illinois Supreme Court has found, to a structural error analysis. And the list of structural errors is short indeed. The defendant has not raised any argument that a structural error such as a biased judge or denial of counsel has occurred. Therefore, that should end the matter. There can be no plain error, regardless of these various arguments. And, in fact, the defendant is attempting to employ a different standard here, saying, well, none of these by themselves are reversible error. Well, that ends it, because that means none of them are plain error. And a cumulative error analysis is not proper under plain error. Because the question is, did a clear or obvious error occur that the trial judge should have realized at the time, this is an error that needs to be fixed immediately? Plain error is not intended for the defendant to come in with a laundry list of evidentiary objections and to say, well, based on all of those, I've shown plain error. That's not the correct test. So the defendant, by coming in here today and saying, none of these by themselves are reversible errors, should really end the analysis on the issues of the trial errors. I will briefly address the excessive sentence issue. The sentence imposed on Toll wasn't back longer. Toll, it's undisputed, was the actual shooter. So he received 45 sentences on a knowing murder conviction. And then he received seven years consecutive of an armed robbery. Unlike with the defendant, the armed robbery does not merge into his murder count. So here, the defendant is serving seven fewer years than the actual shooter. Donahoe received the exact same sentence of 45 years for her role. This sentence of 45 years is squarely within the range set by the legislature. And what was the top limit? Was it 60? Am I right on that? Correct. And the court did consider that he had no prior felonies, but found that was the only mitigating circumstance. The record here supports the trial court's concerns that this was a planned robbery, that he was a willing participant at every stage. And furthermore, the most compelling evidence in the case was in fact found on surveillance videos that were found from a gas station and a McDonald's. We know that the defendant, within hours after watching his brother shoot a man in the head, was there with him holding large amounts of cash, $100 bills, laughing, putting his arm around his brother, joking around. And his brother, Cole, even pulled the cashier at McDonald's. Oh, yeah, we just hit a lick. We just robbed a guy, and now we're going to party, basically, was the attitude. And the court was reasonably very troubled by the fact that someone could be so callous as to behave in this manner immediately after having participated in the robbery of an innocent man. And just very briefly, the instruction on knowing. I think the key point here is that this wasn't a required jury instruction. It was entirely optional. And the defendant's theory of compulsion was treated under a different set of the instructions. The jury was specifically instructed that if it found that the defendant, as he claimed, was scared, paid fear for his life, he didn't go along with his brother, then they had to find the defendant not guilty of armed robbery and, as a consequence, not guilty of felony murder. And to reiterate, that would be a question to be viewed under the plain error standard as the other claims of trial error. We would ask that this court affirm the defendant's conviction and his 45-year sentence. Thank you. Ravelo? As to the waiver argument, I do have the argument set out in pages 24 and 26 of the brief. As to the excessive sentence, everybody was at McDonald's. Everybody was acting in a certain way. So you can't add that onto defendant's sentence. The fact that Cole got seven extra years wasn't on the murder. It was for something else. It was for the armed robbery. So you can't – that's comparing apples and oranges because the extra seven years was for – I guess it was part of his crime, but it was for something else. It wasn't for the murder. They all got 45 years for the murder. Defendant had one misdemeanor prior. One misdemeanor prior. Cole had just gotten out of prison for something else. So obviously those two did not have similar backgrounds. There was simply no reason that they should have gotten the same amount of time. Are there other questions? Thank you. Thank you. I take the matter under advisement. That's good. Good night. This court stands adjourned.